UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA :

      v.                :                25-MJ-148 (MAU)

NATHALIE ROSE JONES     :

**DEFENDANT'S OPPOSITION
TO GOVERNMENT'S MOTION FOR PRETRIAL DETENTION**

Pending before this Honorable Court is the government's request to detain Nathalie Rose Jones pretrial, pursuant to 18 U.S.C. § 3142. Ms. Jones is nearly 50 years old and has no prior convictions. Taking statements allegedly made by Ms. Jones out of context, the government has charged her with making threats against the President of the United States, in violation of 18 U.S.C. § 871(a), and transmitting threats in interstate or foreign commerce, in violation of 18 U.S.C. § 875(c). Read in the context, the statements identified by the government as threats, were not "true threats," but rather speech protected by the First Amendment to the United States Constitution. Moreover, Ms. Jones is neither a danger to the community not a flight risk—to date, she has complied with at least two requests to voluntarily meet with and be interviewed by law enforcement. Ms. Jones's statements and actions demonstrates that the government cannot meet its burden of proving she is a danger. Similarly, there is no evidence to support a finding that she is a flight risk, particularly given her cooperation with law enforcement. The government's argument in its sealed filing that Ms. Jones should be detain for her own well-being and to provide medical care is not only absurd, but would be unlawful. The law permits pretrial detention only if the Court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and

the community[.]" 18 U.S.C. § 3142(e). She cannot be detained for her own safety or to provide healthcare, and the government's suggestion that "prison" is the best place for her to obtain medical care is ridiculous—she would not be held pretrial in a "prison" but rather at the D.C. Department of Corrections Central Treatment Facility ("CHF"). The "Treatment" in that name is a misnomer. CTF is merely one of two detention facilities with notoriously bad medical care. *See Office of the District of Columbia Auditor and Counsel for Court Excellence, Urgent Need for New D.C. Jail (May 28, 2025), avail. at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://cdn.prod.website-files.com/659c0df344c9c8325dd821ca/6837197775af1c53f8f34cf0_JailUpdate_Web_v5.pdf.* Based on the lack of evidence of any "true threat," Ms. Jones's lack of prior convictions, and her cooperation with law enforcement, the Court should release Ms. Jones to return to her apartment in New York City, appear in court as directed, and otherwise stayaway from the District of Columbia and Donald Trump. That is all that is necessary to assure her appearance in court and the safety of the any other person and the community.

## Background

On August 15, 2025, Secret Service Agents met with Ms. Jones at her apartment in New York. She informed them that she planned to travel to the District of Columbia to attend an event and a protest. Agents neither arrested her nor suggested that she should not travel to the District of Columbia. On August 16, 2025, while she was in the District of Columbia, agents contacted her, and she agreed to meet them. After meeting with her, agents arrested her and charged her with making threats between August 2, 2025 and August 16, 2025. She possessed no weapons, had taken not steps to harm anyone, stated that she had no intent to harm anyone, and agreed to the search of her car.

**<u>Argument</u>**

Consistent with the presumption of innocence and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(b) and (c)(1)(B). The Supreme Court has explained: "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *see also United States v. Singleton*, 182 FDA 7, 9 (D.C. Cir. 1999) ("Detention until trial is relatively difficult to impose."). Generally, courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.). Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Id.* at 1405.

Here, the government seeks detention pursuant to 18 U.S.C. § 3142(f)(1)(A) (crime of violence). Even if violations of § 871 and § 875 are crimes of violence under the Bail Reform Act, detention is permissible only if there are no conditions or combination of conditions that will reasonably assure the safety of the community and appearance in court. There is no rebuttable presumption that applies, *see* 18 U.S.C. § 3142(e)(3), and the government bears the burden of proof.

The government cannot meet that burden here. Ms. Jones has no criminal history. Counsel verified her address through her neighbor (and law enforcement verified her address by interviewing her there). Most importantly, she did not make any "true threat," possessed no

3

weapons or ability to harm Donald Trump, took no steps toward harming him, stated that she had no intent to harm him, and cooperated with law enforcement. All of the Bail Reform Act factors weigh in favor of release on personal recognizance.

### A. Nature and Circumstances of the Offense and Weight of the Evidence

Ms. Jones is charged with making threats in violation of 18 U.S.C. §§ 871(a) and 875(c). As the Supreme Court recent reiterated only "true threats" are not protected by the First Amendment. *Counterman v. Colorado*, 143 S.Ct. 2106, 2114 (2023). Threats statutes must be interpreted "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Watts v. United States*, 394 U.S. 705, 708 (1969) (internal quotation omitted). Hyperbolic statements are not "true threats." As the Court explained:

> The "true" in that term distinguishes what is at issue from jests, "hyperbole," or other statements that *when taken in context* do not convey a real possibility that violence will follow (say, "I am going to kill you for showing up late"). *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam). True threats are "serious expression[s]" conveying that a speaker means to "commit an act of unlawful violence." *Black*, 538 U.S. at 359, 123 S.Ct. 1536. Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat, as this Court recently explained. *See Elonis v. United States*, 575 U.S. 723, 733, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015). The existence of a threat depends not on "the mental state of the author," but on "what the statement conveys" to the person on the other end. *Ibid.* When the statement is understood as a true threat, all the harms that have long made threats unprotected naturally follow. True threats subject individuals to "fear of violence" and to the many kinds of "disruption that fear engenders." *Black*, 538 U.S. at 360, 123 S.Ct. 1536 (internal quotation marks omitted).

*Counterman*, 143 S.Ct. at 2114. The standard for determining what is a "true threat" is not a

4

simple objective standard. To ensure the First Amendment is not impinged, the government must also demonstrate that the speaker was subjectively aware that the statements could be understood as threats, using a recklessness standard. *Id.* at 2119.

Here, the complaint, ECF 1, does not clearly identify which statements the government has charged as threats, but the government identifies five in its memorandum in support of detention:

- June 17, 2020, phone call, to the Office of the Director of National Intelligence's Public Affairs Hotline, whereby Defendant stated, among other things, that "[she] should just kill [POTUS] because he is racist."

- August 6, 2025, Facebook post, which stated, among other things, "I am willing to sacrificially kill this POTUS by disemboweling him and cutting out his trachea[.]"

- August 14, 2025, email, which stated, among other things, "I am available to kill this man . . . by disemboweling him and cutting out his trachea[.]"

- August 14, 2025, report by N.G. that N.G. received an email from Defendant threating to "disembowel" the POTUS.

- August 15, 2025, interview, whereby Defendant stated, among other things, that: (i) if she had the opportunity, she would take the POTUS's life; (ii) she would "kill him out at the compound" if she had to; and (iii) if she had access to a knife or bladed object, she would use the items to carry out her mission of killing the POTUS.

The first in that list cannot be a charged threat, because even if it could be interpreted as a true threat, rather than hyperbole, the statute of limitations has run. *See* 18 U.S.C. § 3281 (five year statute of limitations). Nor could a statement made five years ago, that was never charged as a threat, support detention.

As to the second and third listed statements, the government's choice of where to begin

5

the quotations and use of brackets to end the sentences removes the context that demonstrates the statements are hyperbolic and not serious expressions of an intent to commit harm, and that these were part of what can only be described as a delusional plan conditioned on the involvement of the Army and the CIA. The full quotes with the portions the government excluded are in red are:

- August 6, 2025, Facebook post, which stated, among other things, "Here's where we are: I literally told FBI in five states today that I am willing to sacrificially kill this POTUS by disemboweling him and cutting out his trachea with Liz Cheney and all The Affirmation present and you did not come to my home this way at all."

- August 14, 2025, email, which stated, among other things, "But now, I'm letting you know that I am available to kill this man at the old Cranberry Farm at Aberdeen Proving Ground after the ceremony at the White House by disemboweling him and cutting out his trachea if you will recruit me CIA."

The full context of the fourth and fifth statements identified by the government similarly demonstrates that they were hyperbolic and not serious expressions of an intent to commit harm. It appears that the fourth listed statement is merely a report of the third statement quoted in full above—which was conditioned on being recruited by the CIA. The fifth listed statements are statements made to agents when they interviewed Ms. Jones at her apartment on August 15, 2025. The email report of that interview states that she told them that she had "hoped to get in touch with the 3rd U.S. Infantry Regiment, also known as the 'Old Guard,' in effort to arrest President Trump and peacefully remove him from the position of United States President." The government has not produced a recording of that interview or a full report of what was said, but whatever was said, the agents did not respond by arresting or detaining Ms. Jones. The government does not explain how those statements now support pretrial detention when the agents did not consider that they warranted arrest at the time they were allegedly made.

Even if these statements could be considered "true threats," Ms. Jones's additional statements and actions indicate that she had no intention of harming Donald Trump and is not a danger to him. She told agent that she had no intention of taking the President's life. She voluntarily met with agents and consented to a search of her vehicle, and agents found nothing to suggest a true danger.

### B. Potential Danger to Any Person or the Community

The issue before the Court is whether Mr. Jones will present a danger to any other person or the community if released and is forward-looking. *United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021) (Katsas, J. concurring in part and dissenting in part) (detention turns on "specific, forward-looking assessment of whether [the defendant] currently pose[s] an unmitigable threat to public safety"). Here, the danger the government points to is potential danger to Donald Trump. As noted above, there is no such danger, but even if there were, that danger could be mitigate with a stay away order and, if necessary, GPS monitoring. Ms. Jones has complied with all law enforcement requests to date and would continue to do so.

### C. History and Characteristics of Mr. Jones

Ms. Jones has no criminal history. The government argues that she has been making threats for years, but the government has not previously charged her with making any threats—despite awareness of the statements and her location—suggesting that law enforcement did not consider any previous statements to be "true threats."

Ms. Jones previously worked as a pharmacist in Indiana for many years and then moved to an apartment in New York City. Undersigned counsel has verified her address through her next-door neighbor, who reports that Ms. Jones is a good neighbor and causes no problems or

disturbances in the building. She sees Ms. Jones regularly in the building and has seen no evidence of misbehavior.

With regard to the issue raised in the government's sealed filing, counsel will make representations at the hearing on the government's motion.

## Conclusion

Ms. Jones in not a danger to Donald Trump or anyone in the community, nor is she a risk of flight. The government has offered no evidence that supports its burden. For these reasons, Ms. Jones should be released on her personal recognizance, on the conditions that she live at her address in New York and stay away from the District of Columbia and Donald Trump.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

MARY MANNING PETRAS
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Washington, D.C. 20004
(202) 208-7500